**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United States of America, | Crim. No. 08-395 (RHK/JJG) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| Antoine Raymone Killing (05), | |
| Defendant. | |

---

JEANNE J. GRAHAM, United States Magistrate Judge

The above-captioned case came before the undersigned on May 14, 2009, for a hearing

on Defendant Antoine Raymone Killing's dispositive motions.  This case is scheduled to be tried

before the Honorable Richard H. Kyle and was referred to this Court for resolution of pretrial

matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

I.      **BACKGROUND**

Brent Fair ("Fair") is an investigator with the Benton County Sheriff's Office and

assigned to the Central Minnesota Drug and Gang Task Force ("Task Force").  He has worked at

the Benton County Sheriff's Office for almost five years, and with the Task Force for three and a

half years.  Fair has been trained for more than 200 hours on investigating and interdicting

controlled substance crimes, and he is certified in basic narcotics investigation.  As for on-the-

job experience, Fair has been involved in more than 3000 narcotics investigations and has

conducted hundreds of traffic stops.  He executes about eighty search warrants a year and is the

affiant on about a quarter of those.

In his capacity as a law enforcement officer, Fair has encountered Defendant Antoine

Raymone Killing ("Killing") many times at local events, public gatherings, rap concerts, fairs, and traffic stops. Fair knows Killing by sight and has spoken with him numerous times. Various sources have told Fair over the years that Killing is involved in narcotics trafficking, specifically crack cocaine, from Minneapolis to St. Cloud, and that Killing is a member of a gang known as the Detroit Boys. The Task Force has been investigating the Detroit Boys gang for several years, and Fair knew that Killing was one of the targets of the investigation.

On September 10, 2008, Task Force Officer Dennis Otterness ("Otterness") telephoned Fair and said he had just received information from a confidential reliable informant ("CRI") that Killing was driving from Minneapolis to St. Cloud and might be in the possession of cocaine. Otterness said that Killing would be traveling in either his own green car or Snoop's ex-girlfriend's vehicle. Fair determined that Snoop was Jermaine Rice and that Snoop's ex-girlfriend was Cierra Oberg ("Oberg"). Fair dispatched several officers to locations along the highway from Minneapolis to St. Cloud. He also located Oberg's address—1225 14th Street North, Apartment 105, St. Cloud, Minnesota—from a law enforcement database. Fair drove to Oberg's apartment building to conduct surveillance, and once there, saw that the building directory listed an "M. Oberg" at Apartment 105.

Not long afterwards, Fair saw a white Jeep Grand Cherokee with heavily tinted windows drive into the parking lot of the apartment complex. His attention was drawn by the window tint, and he thought the Grand Cherokee might be Oberg's car. Fair checked a police database for vehicles registered to Oberg's parents and learned that her father, Roger Oberg, owned a white Jeep Grand Cherokee.[1] Fair obtained the license plate information for Roger Oberg's vehicle,

---

[1] At some point, Fair verified with Oberg's father that he owned the Grand Cherokee and had lent it to his daughter. Fair also verified that Killing had no interest in the vehicle.

and it matched the license plate of the vehicle in the parking lot.

About five minutes later, the Grand Cherokee left the apartment complex. As it drove by, Fair saw a woman driving the vehicle who matched a photograph of Oberg. He also saw Killing in the front passenger seat. Fair followed the vehicle as it drove though St. Cloud and observed it make numerous evasive maneuvers, as well as violate several traffic laws. In Fair's experience, this sort of driving activity is common with drug traffickers who are engaged in a drug transaction and are attempting to determine if someone is watching or following them. Fair specifically saw the Grand Cherokee drive left of center and roll through two stop signs, which are violations of Minnesota traffic laws. Fair also suspected the windows were illegally tinted. He decided to stop the vehicle based on the traffic violations, the window tint, and his belief that Oberg and Killing possessed a controlled substance.

Fair activated his emergency lights, and Oberg pulled over. Fair approached, asked Oberg for her identification, and confirmed that Killing was the front seat passenger. Fair verbally confirmed with Oberg that her address was 1225 14th Street North, Apartment 105, which was the address on her driver's license. In prior traffic stops involving Killing, Fair thought he was polite and cooperative. But on September 10th, Killing appeared very nervous. His hands were shaking, and he was chain smoking. He complained that the police were harassing him, and he was not cooperative. Fair asked Oberg for consent to search her vehicle, but before she could respond, Killing interjected and told her not to consent.

Based on all of the information known to Fair, he decided to call a canine investigator to the scene. The investigator and his dog arrived in less than fifteen minutes, and Fair removed Oberg and Killing from the vehicle. The dog sniffed the exterior of the vehicle and alerted to the presence of a controlled substance. The dog then sniffed the interior of the vehicle and alerted

near the headliner on the front passenger side.  Fair pulled down the headliner and saw several baggies with suspected narcotics inside.  The packaging, separate baggies with equal amounts inside each baggie, was consistent with distribution.  Field-testing confirmed that the substance was cocaine, and Killing and Oberg were placed under arrest.  Less than twenty minutes had passed between the time the vehicle was stopped and the arrests.

Later that day, Fair applied for a search warrant for Oberg's apartment.  In his supporting affidavit, he meticulously recounted all of the above information, as well as some additional details.  A judge signed the warrant, and it was executed.  Unspecified items of evidentiary value were seized from the apartment.

## II.    DISCUSSION

Killing filed three dispositive motions: a Motion to Suppress Electronic Surveillance Evidence (Doc. No. 169), a Motion to Suppress Evidence from Search and Seizure (Doc. No. 170), and a Motion to Suppress Statements (Doc. No. 171).  Based on the evidence presented at the hearing and the representations of counsel, only the Motion to Suppress Evidence from Search and Seizure is contested.  The other two motions should be denied as moot.

Killing argues that the evidence seized from the Grand Cherokee should be suppressed because Fair lacked probable cause to stop the vehicle.  It is well established, however, that when a law enforcement officer observes even a minor traffic violation, he has probable cause to stop the vehicle.  *See United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990).  Here, Fair saw the Grand Cherokee drive left of center and fail to completely stop at a stop sign, which are violations of Minnesota traffic laws.  Even apart from Fair's suspicions that the windows were illegally tinted and that Oberg and Killing possessed a controlled substance, Fair had probable cause to stop the vehicle.

4

Killing next challenges the length of his detention during the stop. Once a vehicle is lawfully stopped, any subsequent detention of the occupants must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* at 502 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The officer may request the driver's license and ask questions about the driver's destination and purpose. *See United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (citations omitted). If the officer reasonably suspects other, drug-related criminal activity is afoot, he may detain the vehicle and its passengers long enough to conduct a dog sniff. *See id.* at 917

Fair had not only probable cause to stop the vehicle for driving violations, but also a reasonable and articulable suspicion that Killing and Oberg possessed a controlled substance. Fair had received information from Otterness that a CRI reported that Killing left Minneapolis with a quantity of cocaine earlier that day. Although Fair did not speak directly with the CRI, he was entitled to rely on the information from Otterness, as the two officers were part of an investigative team. *See United States v. Robinson*, 119 F.3d 663, 666-67 (8th Cir. 1997) (citation omitted). It follows that Fair was under no duty to personally confirm the CRI's reliability given Otterness's description of the CRI as reliable. Even so, the CRI's reliability was confirmed when some of his information was independently corroborated. For instance, the CRI said that Killing was traveling from Minneapolis to St. Cloud, and Fair located him in St. Cloud not long afterward. The CRI also said that Killing would be traveling with Oberg, possibly in her vehicle, and Killing was in fact traveling with Oberg in her car. Thus, the information from the CRI, as relayed by Otterness, was properly a component of Fair's reasonable suspicion that Killing was engaged in drug-related criminal activity.

In addition to the information from Otterness, Fair already suspected that Killing was

involved in drug trafficking and was a member of the Detroit Boys gang, based on other investigations. Fair had seen the Grand Cherokee driving erratically in an attempt to detect surveillance, and he had observed Killing's uncharacteristically nervous and uncooperative behavior during the traffic stop. The Court concludes that the totality of the information known to Fair at the time of the stop gave him, at minimum, a reasonable and articulable suspicion to believe that Oberg's car contained a controlled substance. Fair was therefore justified in expanding the scope of the stop beyond the traffic offenses to investigate his suspicion of drug possession, and in particular, to request the assistance of a drug-sniffing dog. *See United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004). Under the circumstances, it was reasonable to detain Killing for fifteen minutes while waiting for the dog to arrive. *See United States v. Linkous*, 285 F.3d 716, 721 (8th Cir. 2002) (approving nineteen-minute detention).

Thus far, the Court has concluded that Oberg's vehicle was lawfully stopped and Killing lawfully detained. Killing does not challenge the constitutionality of the vehicle search itself, perhaps implicitly acknowledging he does not have standing to do so. Indeed, there is no evidence in the record that Killing had either an ownership right or a possessory interest in the Grand Cherokee or any of its contents. Thus, he had no legitimate expectation of privacy in the car or its contents. As a mere passenger with no privacy or possessory interest, Killing may challenge the initial stop and his own detention, but he may not challenge the search of the car. *See Rakas v. Illinois*, 439 U.S. 128, 148 (1978); *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001). Evidence seized from the Grand Cherokee should not be suppressed.

Killing next argues for suppression of the evidence seized from Oberg's apartment, claiming he was an overnight guest at the apartment the night before. "In order to show a legitimate expectation of privacy in the searched premises, the person challenging the search has

the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) (citing *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990)). Relevant factors include "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." *Id.* (citations omitted).

Nothing in the record supports Killing's assertions, made for the first time in his post-hearing memorandum, that Oberg was his girlfriend or that he was an overnight guest at her apartment. Killing offered no evidence on this issue whatsoever, even though it was his burden to do so. The Court therefore must conclude that Killing had no interest in the apartment or its contents, and Killing may not challenge the validity of the search warrant or the search of Oberg's apartment.

## III.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Antoine Raymone Killing's Motion to Suppress Electronic Surveillance Evidence (Doc. No. 169) be **DENIED AS MOOT**;

2. Defendant Antoine Raymone Killing's Motion to Suppress Evidence from Search and Seizure (Doc. No. 170) be **DENIED**; and

3. Defendant Antoine Raymone Killing's Motion to Suppress Statements (Doc. No. 171) be **DENIED AS MOOT**.


Dated this 3rd day of June, 2009.                    s/ *Jeanne J. Graham*

                                                JEANNE J. GRAHAM
                                                United States Magistrate Judge


## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **June 17, 2009**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or if the district judge directs otherwise.